UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| BARNEY VINCE RUSSO, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CLEARWIRE US, LLC; CLEAR WIRELESS, LLC; CLEARWIRE CORPORATION; and SPRINT NEXTEL CORPORATION,<br><br>Defendants. | 2:12-CV-01831-PMP-VCF<br><br>ORDER |

Currently before the Court is Defendants Clearwire US, LLC; Clear Wireless, LLC; and Clearwire Corporation's (collectively, "Clearwire") Motion to Dismiss (Doc. #14), filed on November 2, 2012. Plaintiff Barney Vince Russo ("Russo") filed an Opposition (Doc. #24) on November 27, 2012. Clearwire filed a Reply (Doc. #30) on December 17, 2012.

**I. BACKGROUND**

The following factual recitation is derived from Russo's Complaint. (Notice of Removal (Doc. #1), Ex. B ["Compl."].) For purposes of Clearwire's Motion to Dismiss, the Court accepts the Complaint's factual allegations as true. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Clearwire hired Russo as a retention representative on March 26, 2007. (Compl. at 4.) At that time, Clearwire's managers were aware that Russo has macular degeneration and is legally blind. (Id.) Clearwire's managers also were aware that Russo needed certain

1  accommodations relating to computer use and other tasks because of his eye condition. (Id.
2  at 3-4.) To accommodate Russo's disability, Clearwire hired Russo's wife, Natalie Russo
3  ("Natalie"), with the understanding that the two would be working the same shifts so she
4  could assist him with taking his lunch and his medication. (Id.)

5  Early in his employment, Russo was asked to fill in for another employee and
6  conduct a customer retention training session. (Id. at 5.) His impressive performance
7  prompted Clearwire to ask him to conduct the training sessions on a regular basis and also
8  to re-write portions of the company's training materials. (Id.) Russo worked as a customer
9  retention trainer for the remainder of his employment with Clearwire, performing training
10 sessions in Las Vegas, Nevada; Milton, Florida; and, via webcam, Ireland. (Id.) Clearwire
11 allowed Russo to select an assistant, Adam Owen ("Owen"), who aided him throughout the
12 day with drafting and responding to emails. (Id.)

13 Throughout Russo's employment, Clearwire repeatedly acknowledged that he
14 excelled in his position. (Id. at 5-6.) He was nominated for the "Clearly the Best Award," a
15 quarterly employee recognition award, twelve consecutive times, although he was passed
16 over each time. (Id. at 6.) On one such occasion, in early 2009, a manager, Joann Abraham
17 ("Abraham"), told him, in front of others, that he deserved the award and should have
18 received it but that the company was concerned he would be precluded from taking
19 advantage of the prize – an all-expenses-paid trip to Hawaii – as his disability prevents him
20 from flying. (Id.) Russo also alleges that, on at least three occasions, employees he had
21 trained were promoted to management positions over him. (Id.)

22 In November of 2009, Clearwire was acquired by, or otherwise merged with,
23 Defendant Sprint Nextel Corporation ("Sprint"). (Id.) Following the merger, Sprint
24 installed a new management team to replace Clearwire's management team. (Id.)

25 Around the time of the merger, Clearwire manager Amy Monaco ("Monaco")
26 discouraged Russo from applying for an open management position in a new training

1 department, assuring him that his retention department would maintain its current training
2 duties. (Id. at 7.) On another occasion, Abraham told him not to apply for an open trainer
3 position because he "could not travel" due to his eye condition and because the position
4 required "a lot of computer work." (Id.) Russo alleges he was discouraged from applying
5 for other open management positions because he "could not do all of the computer work."
6 (Id.)

7 When the new training department opened, Owen was transferred there, leaving
8 Russo without an assistant. (Id.) Russo approached managers Monaco and Karla Knowlton
9 ("Knowlton") and asked them to secure for him a computer program designed to help the
10 visually impaired read emails and do other computer work. (Id. at 8-9.) The managers did
11 not respond to repeated requests for this computer program for between twelve and fourteen
12 weeks. (Id. at 9.) On January 20, 2010, Clearwire installed a dictation program on Russo's
13 computer that was designed for people who could not type. (Id.) This program was not the
14 one Russo had requested and was of no use to him. (Id.)

15 After Clearwire failed to provide him with a proper computer program, Russo
16 asked Monaco and Knowlton for an administrative assistant. (Id. at 9-10.) His request was
17 denied, but they agreed to provide him with a "reader," Frank Zahbrowski ("Zahbrowski"),
18 who would read Russo his emails twice a day for thirty minutes each morning and
19 afternoon. (Id.) According to Russo, however, a supervisor called Zahbrowski away from
20 these duties "roughly 75 percent of the time," making Zahbrowski of little help to Russo.
21 (Id. at 10.)

22 On December 5, 2009, Russo's call center was moved to a new building
23 ("building three"), which had "very bright and harsh fluorescent lighting," impairing the
24 little vision Russo had left and causing him to bump into things around the office. (Id. at 8.)
25 When Russo asked to be moved to a part-time schedule to alleviate his problems with the
26 lighting, supervisors asked him to provide a note from his doctor verifying that he was

3

1 capable of working at all. (Id.)  He provided the note, but his request for a part-time
2 schedule was not granted for another three weeks. (Id.)  Clearwire denied Russo's requests
3 to move to another building or to have the lighting changed. (Id. at 10-11.)

4       At some point, Clearwire attempted to change Natalie's work schedule such that
5 she and Russo would not be working together at the same time, but Natalie refused to
6 change schedules. (Id. at 10.)  Clearwire terminated Natalie on February 4, 2010, ordering
7 her to leave the premises without helping Russo with his lunch or medication. (Id.)  This
8 left Russo without assistance with those tasks for the remainder of his employment. (Id. at
9 10-12.)

10       Shortly thereafter, Russo resigned, with his last day of work to be April 22, 2010.
11 (Id. at 11.)  He informed Monaco and Knowlton that the situation with the lighting was
12 causing him physical pain. (Id.)  Monaco and Knowlton told him that because of his
13 situation, he would be allowed to resign without providing two weeks notice, and that if the
14 conditions with the lighting changed, they would call him and he would be eligible for re-
15 hire. (Id.)  By this time, Russo's difficulties were causing him to suffer anxiety, insomnia,
16 recurring dreams, and the stress-induced progression of his macular degeneration. (Id. at
17 16-17.)

18       In June 2010, two months after Russo had left Clearwire, the company hired a
19 contractor to adjust the lights in response to the complaints of several non-disabled
20 employees. (Id.)  The time for the renovations was chosen "because that blind guy had
21 left." (Id.)  Clearwire then moved Russo's former division back to its previous location and
22 out of building three. (Id.)  However, Russo was not contacted for re-hire. (Id. at 11-12.)

23       On January 19, 2011, Russo filed a complaint with the Equal Employment
24 Opportunity Commission ("EEOC") and the Nevada Equal Rights Commission ("NERC"),
25 alleging Clearwire discriminated against him on the basis of his disability by refusing to
26 offer him reasonable accommodations and by refusing to promote him. (Id. at 12 & Ex. 1.)

4

1 On March 28, 2012, the EEOC issued a letter of determination stating the agency's finding
2 that there was cause to believe Clearwire denied Russo reasonable accommodations and
3 that he was constructively discharged in violation of the Americans with Disabilities Act of
4 1990, as amended, 42 U.S.C. § 12101 et seq. ("ADA"). (Id. at 12 & Ex. 2.) The EEOC
5 issued a right to sue letter on June 28, 2012. (Id. at 12 & Ex. 3.)

6 Russo filed this action against Clearwire and Sprint in Nevada state court on
7 August 30, 2012. (Id. at 1.) Defendants removed the action to this Court on October 22,
8 2012. (Notice of Removal (Doc. #1).) Russo asserts seven claims for relief in the
9 Complaint: discrimination in violation of the ADA (count one), failure to engage in the
10 interactive process in violation of the ADA (count two), violation of Nevada Revised
11 Statutes § 613.330 (count three), intentional infliction of emotional distress ("IIED") (count
12 four), negligent infliction of emotional distress ("NIED") (count five), negligent training
13 and supervision (count six), and injunctive relief (count seven). Clearwire now moves to
14 dismiss counts three through seven for failure to state a claim. Russo opposes dismissal.

15 **II. LEGAL STANDARD**

16 A properly pled complaint must provide "[a] short and plain statement of the
17 claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When
18 considering a motion to dismiss under Rule 12(b)(6), the Court accepts "[a]ll allegations of
19 material fact in the complaint . . . as true and construe[s them] in the light most favorable to
20 the non-moving party." Vignolo v. Miller, 120 F.3d 1075, 1077 (9th Cir. 1997). There is a
21 strong presumption against dismissing an action for failure to state a claim. Ileto v. Glock
22 Inc., 349 F.3d 1191, 1200 (9th Cir. 2003). However, a formulaic recitation of a cause of
23 action with conclusory allegations is not sufficient; a plaintiff must plead facts showing that
24 a violation is plausible, not just possible. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
25 (citing Twombly, 550 U.S. at 556-57).
26 //

### III. DISCUSSION

#### A. Violation of Nevada Revised Statutes § 613.330 (count three)

Clearwire moves to dismiss Russo's Nevada Revised Statutes § 613.330 discrimination claim on the grounds that Russo filed suit later than the 180-day deadline. Specifically, Clearwire argues that Russo's claim is authorized by § 613.420, and therefore § 613.430 requires that his claim be filed within 180 days of the act complained of. Russo responds that § 613.420 does not govern his claim because that statute "prescribes[s] the rights for judicial review of an adjudicated administrative decision, not a time limitation on the filing of the charge [with NERC]." (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 7 (emphasis omitted).) Russo further argues that his claim is subject to a 300-day limitation pursuant to Nevada Revised Statutes § 233.160(1)(b) and that it is timely.

Under § 613.330(1)(a), it is an unlawful employment practice to discharge, or otherwise discriminate against, any person in terms of his or her compensation, terms, conditions, or privileges of employment because of that individual's disability. The relevant statute of limitations for a § 613.330(1)(a) claim mandates that "no action authorized by NRS 613.420 may be brought more than 180 days after the date of the act complained of," subject to a period of tolling while a complaint of discrimination is pending before NERC. Nev. Rev. Stat. § 613.430. Section 613.420 authorizes the filing of employment discrimination claims in district court once a plaintiff has exhausted his administrative remedies by filing a complaint with NERC. Nev. Rev. Stat. § 613.420; Pope v. Motel 6, 114 P.3d 277, 311 (Nev. 1990). As an employment discrimination claim, Russo's district court action was authorized by § 613.420 once he satisfied the exhaustion requirements, and therefore is subject to the 180-day statute of limitations imposed by § 613.430.

Russo fails to plead facts showing that his claim was timely filed. His last day of work, the date of his alleged constructive discharge, was April 22, 2010. He filed his

charge of discrimination with EEOC and NERC on January 19, 2011, 272 days later. At that point, Russo already had exceeded the 180-day time limit for filing a district court action as set forth in § 613.430.

As for Russo's argument that his claim was timely because it was filed within 300 days of his constructive discharge, § 233.160(1)(b) does not apply to claims in which a plaintiff seeks to file a district court action. Instead, § 233.160(1)(b) provides that a plaintiff has 300 days from the date of a discriminatory employment practice to file a complaint with NERC. A plaintiff might timely file a complaint with NERC within the 300-day deadline, but be unable to file a district court action once that complaint has been disposed of by NERC if 180 days had elapsed before the NERC complaint was filed. Such is the case here. Although it is somewhat confusing that a plaintiff has 300 days to file a complaint with NERC and only 180 days to bring suit in district court, nothing prevented Russo from filing his complaint with NERC before § 613.430's 180-day deadline, which would have tolled the limitations period for his district court action. The Court therefore will dismiss with prejudice Russo's claim for violation of § 613.330.

### B. IIED (count four)

Clearwire moves to dismiss Russo's IIED claim, arguing that the Complaint fails to allege sufficiently extreme and outrageous conduct and that the claim is barred by the exclusive remedy provision of the Nevada Industrial Insurance Act ("NIIA").[1] Russo

---

[1] Clearwire also asserts in its Motion to Dismiss that the Plaintiff "does not allege facts sufficient to plausibly suggest . . . severe or extreme emotional distress." (Mot. to Dismiss at 4.) Clearwire provides no further support for this argument. To state an IIED claim, a plaintiff must allege facts showing the suffering of severe or extreme emotional distress. Dillard Dep't Stores, Inc. v. Beckwith, 989 P.2d 882, 886 (Nev. 1999) (en banc). A plaintiff is required to "demonstrate that he or she has suffered some physical manifestation of emotional distress in order to support an award of emotional damages." Kennedy v. Carriage Cemetery Servs., Inc., 727 F. Supp. 2d 925, 933 (D. Nev. 2010) (quotation omitted). In Shoen v. Amerco, Inc., the Nevada Supreme Court held that material issues of fact existed as to whether an employee had

7

responds that Clearwire's conduct was extreme and outrageous and that he specifically has alleged intentional extreme and outrageous conduct that supports an IIED claim and also prevents his claim from falling under the NIIA's preemptive bar.

### 1. Extreme and Outrageous Conduct

To state an IIED claim, a plaintiff must allege facts showing: (1) the defendant's conduct was extreme and outrageous; (2) with either the intention of, or reckless disregard for, causing emotional distress; (3) the plaintiff suffered severe or extreme emotional distress; and (4) actual or proximate causation. Dillard Dep't Stores, Inc. v. Beckwith, 989 P.2d 882, 886 (Nev. 1999) (en banc). Extreme and outrageous conduct exceeds "all bounds of decency" and is "utterly intolerable in a civilized community." Maduike v. Agency Rent-A-Car, 953 P.2d 24, 26 (Nev. 1998) (per curiam) (citation omitted). The Court determines whether the defendant's conduct may be regarded as extreme and outrageous so as to permit recovery, but, where reasonable people may differ, the jury determines whether the conduct was sufficiently extreme and outrageous to result in liability. Chehade Refai v. Lazaro, 614 F. Supp. 2d 1103, 1121 (D. Nev. 2009); Restatement (Second) of Torts, § 46, cmt. h (1965).

The tort of IIED is recognizable in the employment termination context. Shoen v. Amerco. Inc., 896 P.2d 469, 476-77 (Nev. 1995) (per curiam) (finding there were factual issues as to whether retaliatory termination, discontinuation of retirement benefits, pursuit of litigation with express goal of harassment, and verbal threats and attempted assault by

---

suffered extreme emotional distress where he alleged he was diagnosed as "situationally depressed," received psychiatric treatment, and took medication to address his depression. 896 P.2d 469, 476-77 (Nev. 1995) (per curiam). Here, Russo similarly alleges depression, but also alleges anxiety, insomnia, recurring dreams, and the "stress-induced progression of his macular degeneration," a physical manifestation of his distress. (Compl. at 16-17.) Accepting all allegations in the Complaint as true, Russo plausibly has pled he suffered extreme emotional distress. Therefore, the Court will deny Clearwire's Motion to Dismiss Russo's IIED claim for failure to plead severe or extreme emotional distress.

8

member of board of directors was sufficiently extreme and outrageous).  However, "[a] simple pleading of personnel management activity is insufficient to support a claim of [IIED], even if improper motivation is alleged."  Welder v. Univ. of So. Nev., 833 F. Supp. 2d 1240, 1245 (D. Nev. 2011) (citation omitted).  "Personnel management consists of such actions as hiring and firing, project assignments, promotion and demotions, performance evaluations and other similar acts."  Id.

For example, in Welder, a pharmacy professor did not sufficiently allege extreme and outrageous conduct where she claimed a supervisor issued letters reprimanding her for missing work for medical treatment for bladder cancer.  Id. at 1242.  Her requests that time off be provided as a reasonable accomodation under the ADA were denied, and she was pressured instead to take time off pursuant to the Family Medical Leave Act.  Id.  Further, she was notified of possible exposure to a sexual harassment suit stemming from her conduct in the classroom, was assigned a "remediation plan" to address the issue, and was barred from campus pending completion of the plan.  Id.  When she completed the remediation plan late, she was terminated.  Id.  The plaintiff claimed the actions were discriminatory based on age and were taken in retaliation for her missing work for medical procedures after being diagnosed with bladder cancer.  Id.  The Court held that these acts were not extreme and outrageous because termination, even if done with discriminatory intent, "does not in itself amount to extreme and outrageous conduct."  Id. at 1245-46 (quotation omitted).  The Court additionally held that the employer's other acts were trivialities or fell under "normal employment relations."  Id. at 1246.

Extreme and outrageous conduct has been found in the context of some employee-employer relations, however.  For example, in Dillard, the Nevada Supreme Court found the following to be sufficiently extreme and outrageous to warrant upholding a verdict awarding damages on an IIED claim:

//

9

> Dillard [the employer] did not offer Beckwith, a longtime employee, her previous position as an area sales manager when she returned to work after her injury. This refusal occurred despite the fact that two other area sales manager positions were open for which Beckwith was qualified. She was also forced to take an entry-level position with a forty-percent reduction in salary and was told her demotion was directly related to her claim for workers' compensation. Ultimately fellow employees openly speculated as to the reason for Beckwith's demotion, and her complaints to management that her job situation was having an adverse effect upon her health were ignored.

989 P.2d at 886. Upon demotion, the plaintiff in Dillard was placed in a department where it would be difficult for her to make daily sales quotas. Id. at 884. She was ridiculed by younger employees. Id. She also cited an instance in which she entered a break room and was met with stares and silence, indicating to her that she had been the object of negative gossip. Id.

Reading the facts in the light most favorable to Russo, and drawing all reasonable inferences in his favor, reasonable minds could differ as to whether the conduct he has alleged could be regarded as extreme and outrageous. Russo alleges that Clearwire: (1) refused to promote him and discouraged him from applying for open positions because of his disability; (2) removed the assistant it had agreed to provide, making it more difficult for him to do his job; (3) explicitly denied him a merit award because of his disability, and told him so in front of others; (4) relocated him to a building with lighting conditions that aggravated his macular degeneration; (5) subsequently refused to change those conditions or transfer him back to his former building; (6) frequently called Zahbrowski away from acting as his reader; (7) failed to provide requested computer software that would allow him to do his job; (8) abruptly terminated his wife, on whom he relied in taking his medication and eating his lunch; (9) misrepresented that the company intended to re-hire him if the lighting conditions were changed; and (10) remedied the lighting conditions in building three in response to complaints by non-disabled employees, doing so only after Russo's termination, because "that blind guy had left."

10

The facts of this case are sufficiently similar to those in <u>Dillard</u> such that reasonable minds could differ as to whether Clearwire's conduct was extreme and outrageous. The employer in <u>Dillard</u> told the employee that she was demoted because of her claim for worker's compensation, causing her co-workers to gossip about the demotion in a way that was noticeable to the employee. The employer also took actions that posed health risks to the plaintiff, ignoring her complaints that her demotion was causing her stress and resultant health problems. In addition to these other actions, the employer in <u>Dillard</u> took actions that made it more difficult for the plaintiff to perform her job duties, assigning her to a section of the retail store where it would be difficult for her to make her daily sales quotas.

Here, Abraham told Russo, in front of other employees, that he did not receive the Clearly the Best Award because of his disability. Abraham and other managers discouraged him from applying for open positions because of his disability. These facts, along with the workplace comment that the time for addressing the lighting situation in building three had been selected "because that blind guy had left," support the inference that Clearwire took adverse employment actions against Russo based on his eye condition, and that this treatment was openly discussed in the workplace. Clearwire also took actions that posed health risks to Russo, and ignored complaints and warnings about those risks. It terminated Natalie, on whom it knew Russo relied for taking his lunch and medication. It also moved Russo's department to building three and ignored his complaints that the lighting conditions there aggravated his macular degeneration. Additionally, Clearwire took actions that made it more difficult for Russo to perform his job duties. It removed Russo's assistant, failed to provide him with the correct computer software necessary for him to perform his work, and then provided him with a reader whom it then rendered ineffective.

In light of the precedent set by <u>Dillard</u>, reasonable minds could differ as to

whether the conduct Russo has alleged could be regarded as extreme and outrageous. Accordingly, the Court will deny the Defendants' Motion to Dismiss Plaintiff's IIED claim for failure to allege extreme and outrageous conduct.

### 2. The Exclusive Remedy Provision of the NIIA

Clearwire argues that Russo's IIED claim should be dismissed because the NIIA provides an exclusive remedy for any employee who is negligently injured in the course and scope of employment. Russo responds that the NIIA does not act as a bar because IIED is an intentional tort and the NIIA does not relieve an employer from liability for its intentional torts.

The NIIA's exclusive remedy provision provides that "[t]he rights and remedies provided in chapters 616A to 616D, inclusive, of NRS for an employee on account of an injury by accident sustained arising out of and in the course of the employment shall be exclusive." Nev. Rev. Stat. § 616A.020(1). "[E]mployers do not enjoy immunity, under the exclusive remedy provisions of the workers' compensation statutes, from liability for their intentional torts." Conway v. Circus Circus Casinos, Inc., 8 P.3d 837, 840 (Nev. 2000) (per curiam) (quotation omitted). "The relevant inquiry is not the degree of negligence or even depravity on the part of the employer, but the more narrow question of whether the specific action that injured the employee was an act intended to cause injury to the employee." Id. In Conway, the plaintiffs alleged that their employer was aware they were being exposed to noxious fumes and failed to address it. Id. The plaintiffs argued that exposure to the fumes was the result of an intentional tort on the employer's part, and that this removed their claim from the NIIA's exclusive remedy provision. Id. at 840-41. The Nevada Supreme Court disagreed, reasoning that the alleged facts did not show a deliberate and specific intent to injure the employees on the employer's part simply by its failure to address a known hazardous condition. Id. The NIIA therefore operated as an exclusive remedy. Id.

In contrast here, Russo has alleged that Clearwire's deliberate intent was to cause him severe emotional distress. He claims "Clearwire took specific actions against [him] with the intention of forcing [him] to resign his position." (Compl. at 10). This is to say that Clearwire took the actions outlined above with the intent to cause Russo emotional distress to the point that he would resign. This case is distinguishable from Conway, where the plaintiffs failed to allege facts indicating the employer's refusal to remedy a known hazardous condition was done with a specific intent to cause injury. Here, when viewing the facts in the light most favorable to Russo and drawing all reasonable inferences therefrom in his favor, Russo has alleged such intent. Clearwire therefore cannot enjoy immunity under the NIIA's exclusive remedy provision. Accordingly, the Court will deny Clearwire's Motion to Dismiss Russo's IIED claim as being preempted by the NIIA.

### C. NIED and Negligent Training and Supervision (counts five and six)

Clearwire moves to dismiss Russo's NIED and negligent training and supervision claims on the grounds that both are barred by the exclusive remedy provision of the NIIA. Russo responds that his claims "arise directly from the wrongful termination of his employment," and that, because the NIIA precludes employees from collecting benefits for stress-related injuries caused by an employee's termination, the NIIA does not pre-empt his claim. (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 13.) Clearwire replies that Russo alleges "constructive discharge," rather than termination, and that there is no authority requiring constructive discharge to be treated as a termination under NIIA. (Defs.' Reply in Supp. of Defs.' Mot. to Dismiss at 6.) Clearwire also contends Russo's NIED claim is inconsistent with the position he took on his IIED claim where he alleged his injuries were caused by discriminatory personnel actions, and not solely by termination. Id.

As previously noted, the rights and remedies afforded an employee by the NIIA are exclusive with respect to accidental injuries arising out of and in the course of employment. Nev. Rev. Stat. § 616A.020(1). An employee's stress-related injury is

13

covered under the NIIA if the injury "arose out of an in the course of his or her employment." Id. § 616C.180(1).  Section 616C.180(3) provides that "[a]n injury or disease caused by stress shall be deemed to arise out of and in the course of employment only if the employee proves by clear and convincing medical or psychiatric evidence that . . . [t]he stress was not caused by his or her layoff, the termination of his or her employment or any disciplinary action taken against him or her."

Here, although Russo alleges he was constructively discharged, he does not allege the stress he suffered was caused by "termination." Russo cites no authority indicating the term "termination" in § 616C.180(3)(c) includes constructive discharge. Moreover, it cannot be reasonably inferred from the Complaint's allegations that Russo's NIED and negligent training and supervision claims are restricted to injuries arising from his alleged constructive discharge. Rather, Russo's claims are based on allegations regarding Clearwire's conduct towards him for the years before his resignation. For instance, in count five, Russo alleges that "Defendants' acts" were the proximate cause of his injuries. (Compl. at 16-17.) In count six, he alleges that Clearwire failed to properly train and supervise its employees with respect to the ADA and § 613.330, and that the failure to train and supervise caused his injuries. (Id. at 17.) In both claims, Russo incorporates and re-alleges all statements made in the preceding sections of the Complaint, which include, among other things, the removal of his assistant, the refusal to promote him, the explicit denial of a merit prize based on his disability, and his relocation to a building with lighting that aggravated his condition. (Id. at 6-8.) Even when reading the facts in the light most favorable to Russo, and drawing all reasonable inferences in his favor, his NIED and negligent training and supervision claims are based on allegations of Clearwire's conduct throughout his employment and not solely based on his alleged constructive discharge. Because Russo has failed to show that his stress-related injury falls outside the NIIA's coverage under § 616C.180(3)(c), the Court will grant Clearwire's Motion to

14

Dismiss with respect to claims five and six.

### D. Injunctive Relief (count seven)

Clearwire moves to dismiss Russo's injunctive relief claim on the grounds that it is a remedy, not an independent cause of action. Russo responds that a plaintiff may proceed on an injunctive relief claim as an independent cause of action under Chateau Vegas Wine, Inc. v. S. Wine & Spirits of Am., Inc., 265 P.3d 680, 688 (Nev. 2011).

Injunctive relief is a remedy, not a cause of action. State Farm Mut. Auto Ins. Co. v. Jafbros, Inc., 860 P.2d 176, 178 (Nev. 1993) (referring to an injunction as a remedy). Injunctive relief is available "to restrain a wrongful act that gives rise to a cause of action." Chateau Vegas Wine, Inc., 265 P.3d at 684. For example, in Chateau Vegas Wine, Inc., the Nevada Supreme Court upheld the grant of an injunction as an equitable remedy to prevent violation of exclusive franchise rights established under Nevada statute. Id. at 688. Here, Russo cannot state an independent claim for injunctive relief. The Court therefore will grant Clearwire's Motion to Dismiss with respect to count seven. The Court expresses no opinion as to whether Russo may be entitled to injunctive relief on any claims on which he ultimately may prevail.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants Clearwire US, LLC; Clear Wireless, LLC; and Clearwire Corporation's Motion to Dismiss (Doc. #14) is GRANTED in part and DENIED in part. It is GRANTED with respect to claims three, five, six, and seven and DENIED with respect to claim four.

DATED: April 30, 2013

_____
PHILIP M. PRO
United States District Judge